1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   JASON NIELSEN,                     NO. CIV. 2:09-960 WBS KJN

13          Plaintiff,
                                        MEMORANDUM AND ORDER RE:
14      v.                              MOTION FOR SUMMARY JUDGMENT

15   TROFHOLZ TECHNOLOGIES, INC., a
     California Corporation, ANDREW
16   PARKER, an individual, BRENNA
     PEDONE, an individual, YVONNE
17   GLENN, an individual, TROY
     GLENN, an individual and DOES
18   1-10, inclusive,

19          Defendants.
     _____/
20

21                          ----oo0oo----

22

23          Plaintiff Jason Nielsen brought this action alleging

24   that defendants Trofholz Technologies, Inc. ("TTI"), Andrew

25   Parker, Brenna Pedone, Yvonne Glenn, and Troy Glenn discriminated

26   against him based on gender and disability, retaliated against

27   him, created a hostile work environment, and wrongfully

28   terminated him.  Defendants now move for summary judgment on all

                                  1

1  claims pursuant to Federal Rule of Civil Procedure 56.

2  I.   <u>Standard</u>

3          Summary judgment is proper "if the pleadings, the
4  discovery and disclosure materials on file, and any affidavits
5  show that there is no genuine issue as to any material fact and
6  that the movant is entitled to judgment as a matter of law."
7  Fed. R. Civ. P. 56(c).  A material fact is one that could affect
8  the outcome of the suit, and a genuine issue is one that could
9  permit a reasonable jury to enter a verdict in the non-moving
10  party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
11  248 (1986).  The party moving for summary judgment bears the
12  initial burden of establishing the absence of a genuine issue of
13  material fact and can satisfy this burden by presenting evidence
14  that negates an essential element of the non-moving party's case.
15  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).
16  Alternatively, the moving party can demonstrate that the
17  non-moving party cannot produce evidence to support an essential
18  element upon which it will bear the burden of proof at trial.
19  <u>Id.</u>

20          Once the moving party meets its initial burden, the
21  non-moving party "may not rely merely on allegations or denials
22  in its own pleading," but must go beyond the pleadings and, "by
23  affidavits or as otherwise provided in [Rule 56,] set out
24  specific facts showing a genuine issue for trial."  Fed. R. Civ.
25  P. 56(e); <u>Celotex Corp.</u>, 477 U.S. at 324; <u>Valandingham v.</u>
26  <u>Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).  In its inquiry,
27  the court must view any inferences drawn from the underlying
28  facts in the light most favorable to the nonmoving party, but may

1  not engage in credibility determinations or weigh the evidence.

2  <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita Elec. Indus. Co. v. Zenith</u>

3  <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).

4  II.  <u>Evidentiary Objections</u>

5       "A trial court can only consider admissible evidence in

6  ruling on a motion for summary judgment." <u>Orr v. Bank of Am., NT</u>

7  <u>& SA</u>, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P.

8  56(e) and <u>Beyene v. Coleman Sec. Servs., Inc.</u>, 854 F.2d 1179,

9  1181 (9th Cir. 1988)).  Plaintiff has filed twenty-six

10 evidentiary objections to evidence defendants submitted in

11 support of their motion for summary judgment (Docket No. 47) and

12 defendants have filed twenty-six evidentiary objections of their

13 own.  (Docket No. 60.)

14      "[T]o survive summary judgment, a party does not

15 necessarily have to produce evidence in a form that would be

16 admissible at trial, as long as the party satisfies the

17 requirements of Federal Rules of Civil Procedure 56." <u>Fraser v.</u>

18 <u>Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing <u>Block v.</u>

19 <u>City of Los Angeles</u>, 253 F.3d 410, 418-19 (9th Cir. 2001)).  Even

20 if the non-moving party's evidence is presented in a form that is

21 currently inadmissible, such evidence may be evaluated on a

22 motion for summary judgment so long as defendants' objections

23 could be cured at trial.  <u>See</u> <u>Burch v. Regents of the Univ. of</u>

24 <u>Cal.</u>, 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).

25      The parties primarily target each others' statements of

26 undisputed facts, attacking the phrasing of the statements and

27 not the underlying evidence upon which they are made.  Statements

28 of undisputed facts are not evidence, the admissibility of which

1  can be challenged under the Federal Rules of Evidence, but
2  summaries of the material facts contained in the cited evidence,
3  which the court reviews independently.  <u>See</u> Local Rule 260; <u>see</u>
4  <u>also</u> <u>Perma Research & Dev. Co. v. Singer Co.</u>, 410 F.2d 572, 579
5  (2d Cir. 1969) (holding that objections to an affidavit submitted
6  on a motion for summary judgment "must be precise" and "specify
7  which parts of the . . . affidavit should be striken and why");
8  Charles Alan Wright et al., 10B <u>Federal Practice & Procedure</u> §
9  2738 (2010) ("[A] motion to strike should specify the
10 objectionable portions of the affidavit and the grounds for each
11 objection.").  Consequently, those objections attacking the
12 statements of undisputed fact are not well taken and are
13 overruled.

14        In the interest of brevity, as the parties are aware of
15 the substance of their objections and the grounds asserted in
16 support of each objection, the court will not review the
17 substance or grounds of all the objections here.  For the
18 purposes of this motion, plaintiff's objections 14-15, 19, and 20
19 are sustained on hearsay grounds and objections 16-17 are
20 sustained on personal knowledge grounds; the rest are overruled.
21 All of defendants' objections to the evidence cited in
22 Plaintiff's Separate Statement of Undisputed Facts are overruled.

23 III.      Relevant Facts

24        Plaintiff worked for TTI beginning in 2004 (Griffin
25 Decl. Ex. D ("Yvonne Dep.") at 163:22-25), and became a program
26 manager in 2007.  (Griffin Decl. Ex. C ("Nielsen Dep.") at 24:20-
27 22.)  Defendant Andrew Parker became plaintiff's immediate
28 supervisor in December of 2007.  (Nielsen Dep. at 48:5-7.)

4

Plaintiff first suspected that Parker was engaging in an affair with Louann Kelsheimer, another employee at TTI, in May of 2009. (Id. at 148:5-149:3.)  Kelsheimer was a project coordinator at TTI, and did not have any of the same job responsibilities as plaintiff, nor did she report to plaintiff or Parker.  (Id. at 152:3-4, 220:20-221:6; Griffin Decl. Ex. I ("Kelsheimer Dep.") at 10:9-12, 11:13-15, 14:14-17:23, 21:14-21, 21:24-22:2, 23:4-25:2, 42:25-43:1.)  Plaintiff suspected that Parker and Kelsheimer were involved in a romantic relationship because he observed Kelsheimer "float[ing] around like a butterfly," Parker off-loading Kelsheimer's responsibilities onto plaintiff, and distant flirting between the two.  (Nielsen Dep. at 149:16-150:2, 151:4-20.)

Plaintiff approached defendant Brenna Pedone, the manager of Human Resources, near the end of June of 2008 regarding his suspicions about the relationship.  (Id. 159:1-5, 187:21-188:5, 224:23-225:13, 226:8-17.)  Plaintiff claims that he also complained to Pedone on July 23, 2008.  (Id. at 188:6-13, 229:19-230:21, 231:25-232:17.)  After some investigation, Pedone reported the rumor to defendant Yvonne Glenn, the president of TTI, who reported it to defendant Troy Glenn, the vice president, without telling him the source of the rumor.  (Griffin Decl. Ex. F ("Pedone Dep.") at 126:1-128:1, 139:22-140:5; Yvonne Dep. at 240:24-241:22, 242:2-20.)  In August of 2008, without telling him the source of the rumor, Troy pulled Parker aside and told him anything happening between him and Kelsheimer had better stop. (Griffin Decl. Ex. E ("Troy Dep.") at 106:23-107:9, 107:22-108:18.)

1    In June or July of 2008, Kevin Hayashi, another
2    employee at TTI, told plaintiff about and later provided him with
3    sexually suggestive emails between Kelsheimer and Parker.
4    (Nielsen Dep. at 188:17-189:6, 189:19-190:25.)  Jon Rauer, the IT
5    manager at TTI, confirmed the existence of the emails to
6    plaintiff and told him they alluded to something sexual in
7    nature, but neither he nor Hayashi reported the e-mails to TTI
8    management.  (Griffin Decl. Ex. H ("Rauer Dep.") at 8:16-17,
9    16:22-17:7, 17:25-18:23.)

10    In July of 2008, plaintiff and Parker had a brief
11    conversation during a car ride.  (Nielsen Dep. at 163:10-164:7,
12    164:19-22, 165:20-166:6, 167:18-25.)  They were discussing
13    business contracts and accounts when Parker told plaintiff he
14    needed to "get in line" and "quit causing ripples."  (<u>Id.</u>)
15    Plaintiff believed Parker was referring to plaintiff's report of
16    the alleged relationship between Parker and Kelsheimer because of
17    Parker's "tone" and "body language."  (<u>Id.</u>)  Parker denies having
18    any knowledge that plaintiff told anyone at TTI about his alleged
19    relationship with Kelsheimer until sometime after October 7,
20    2008.  (Griffin Decl. Ex. G ("Parker Dep.") at 203:5-21, 210:23-
21    211:6.)

22    Plaintiff alleges that Parker required him to create
23    agendas for weekly division meetings and perform other
24    administrative tasks not part of his job description beginning in
25    January or February of 2008.  (Nielsen Dep. at 152:17-25, 153:6-
26    8, 153:14-154:5.)  Plaintiff also alleges that Parker attempted
27    to make him and other employees conduct product pricing,
28    something that was not within their job responsibilities, in

6

1  March through June of 2008, but that they fought back and Parker

2  required Kelsheimer to do it instead.  (Id. at 154:17-155:17,

3  158:14-18.)  Plaintiff asserts that after June 2008, the only

4  tasks Parker off-loaded from Kelsheimer to him were minimal.

5  (Id. at 158:14-18.)  Plaintiff is not aware of any job benefits

6  that Kelsheimer received that he or anyone else did not.  (Id. at

7  220:8-13, 221:4-222:4.)  Plaintiff was aware of one other inter-

8  office relationship but admits that there was nothing about that

9  relationship that impacted his work environment.  (Id. at 248:14-

10  249:5.)  He also believes that another employee, Lisa Salcedo,

11  received employment benefits such as extra vacation days as a

12  result of a relationship with a supervisor.  (Id. at 253:23-

13  255:2.)  Plaintiff also admits that he was not denied any

14  employment opportunities within TTI that were given to an

15  employee who submitted to sexual advances.  (Id. at 256:6-10.)

16        In 2008, TTI's contract with one of its recurring

17  clients, California National Guard ("CNG"), was set to expire, so

18  TTI prepared a bid for a new contract.  (Parker Dep. at 89:13-

19  91:11.)  Plaintiff was in charge of managing TTI's relationship

20  with CNG, and TTI's practice was to give the lead to the program

21  manager on any proposals related to that employee's accounts.

22  (Nielsen Dep. at 70:1-4, 72:21-73:9.)

23        On May 11, 2008, plaintiff was involved in a motorcycle

24  accident and suffered broken bones and other injuries.  (Nielsen

25  Dep. at 114:3-115:4, 115:15-17, 126:20-127:12.)  Plaintiff

26  notified Parker of his motorcycle accident by e-mail at 12:48

27  a.m. the morning of May 12, 2008, and then notified Troy by e-

28  mail at 8:09 a.m.  (Nielsen Dep. at 115:24-116:15, 117:16-118:13,

7

119:1-16.)   In his email to Troy, plaintiff stated, "[T]his will
cause slight modification of how we run the proposal for CNG."
(Id. Ex. 6.)   Plaintiff remembers a conversation with Troy where
Troy "allud[ed]" to the possibility of someone other than
plaintiff taking the lead on the CNG proposal, but based on
Troy's "body language and tone," plaintiff believed that his job
would be in jeopardy if he did not take the lead.  (Id. at
121:10-122:18.)

          The only accommodation requested by plaintiff as a
result of his injuries was voice recognition software, which he
received.  (Id. at 123:7-18, 124:17-22; Parker Dep. at 99:4-
100:2; Pedone Dep. at 109:16-23, 110:21-25.)   Yvonne also brought
a digital voice recorder to plaintiff's house, and various co-
workers offered plaintiff rides to and from the office.  (Nielsen
Dep. 124:23-125:6, 127:5-12.)

          About halfway through the process of preparing the CNG
proposal, Troy discovered that plaintiff had reorganized the
outline of the proposal contrary to earlier discussions and
determined that it had to be rewritten.  (Troy Dep. at 144:8-
145:17.)   After TTI submitted the completed proposal, plaintiff
admitted in an e-mail to the proposal team that he had "poorly
lead [sic] a proposal team and it showed."  (Nielsen Dep. 134:4-
12, 135:11-21, Ex. 8.)   TTI was ultimately awarded the CNG
contract.  (Parker Dep. at 101:8-10.)

          On August 7, 2008, Parker placed plaintiff on an
unofficial performance improvement plan ("PIP").  (Nielsen Dep.
at 169:21-170:4, 172:2-11, Ex. 9.)   Parker identified areas where
plaintiff needed to increase his performance and effectiveness,

8

including meeting deadlines and improving communication.  (Id. at
172:20-173:8, Ex. 9.)  On October 7, 2008, plaintiff met with
Parker and Pedone to discuss his PIP.  (Id. at 232:23-233:9.)
Parker pointed out specific examples of plaintiff's deficiencies,
and indicated that plaintiff was still failing through continued
missed deadlines and substandard performance.  (Id. at 233:10-
234:4; Parker Dep. at 154:12-155:22, 156:11-157:12, 159:13-
160:19, 164:13-165:19, 166:7-11; Pedone Dep. at 148:6-19, 149:1-
150:15.)  At the meeting, Pedone allegedly told plaintiff that he
should be performing at a higher level based on his salary
(Nielsen Dep. at 234:1-4.), and Parker allegedly asked plaintiff
to resign.  (Id. at 173:18-20.)

Immediately after that meeting, plaintiff called Yvonne
and met with her.  For the first time, he told her about his
belief that Parker was attempting to push him out of the company
because of plaintiff's disclosure of Parker's alleged
relationship with Kelsheimer.  (Id. at 235:23-237:1, 237:16-19;
Yvonne Dep. at 265:1-266:8, 296:6-23.)  He also informed her for
the first time about his belief that Parker and Kelsheimer were
exchanging inappropriate e-mails.  (Nielsen Dep. at 236:12-237:1,
237:16-19; Yvonne Dep. at 265:10-266:8.)

The next day, plaintiff presented a note from his
physician indicating that he required a thirty-day medical leave
of absence, which was granted.  (Nielsen Dep. at 237:20-25,
238:5-10.)  Plaintiff requested a second thirty-day leave the
next month, which was also granted.  (Id. at 242:20-25.)  Under
its leave policy, TTI generally has permitted leaves of absence
for personal reasons for up to thirty-days, but has not permitted

9

employees to take off more than sixty days.  (Yvonne Dep. at 92:16-93:1, 93:6-20.)

During plaintiff's leave, TTI lost its single largest professional services contract.  (Pedone Dep. at 170:17-172:25; Troy Dep. at 141:12-17.)  As a result, TTI was forced to terminate a number of employees and substantially reorganize its workforce.  (Id.)  TTI eliminated all division director positions as well as several business development, engineering, and other professional services staff positions, and eliminated one of five program manager positions, which was plaintiff's position. (Pedone Dep. at 170:17-172:25; Troy Dep. at 126:11-25, 154:18-22; Yvonne Dep. at 254:8-13, 254:21-255:12.)

Following his two thirty-day leaves of absence, plaintiff requested a third leave, this time for sixty additional days.  (Pedone Dep. at 162:14-21; Yvonne Dep. at 271:14-20.) Plaintiff contends that this request was granted.  He provides a document purporting to grant leave signed by Sharlee Davis, the human resources coordinator; defendants contend that the document was not valid because Pedone, not Davis, had the authority to grant leave.  (Mem. of P. & A. in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 5, Ex. 28; see Pedone Dep. at 163:13-18, 165:22-166:8, 166:22-167:3.)  Plaintiff also provides an "Employee Separation Report" dated December 30, 2008 (Pl.'s Opp'n Ex. 29), which states that his employment ended by "Voluntary Resignation" because he "failed to return from leave of absence."  (Id.)  Plaintiff alleges that, regardless of the explanation given in the Employee Separation Report, he was terminated on December 30, 2008.  (Pl.'s Opp'n at 5.)

1           On April 8, 2009, plaintiff filed this action against

2    defendants, alleging gender discrimination in violation of the

3    Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §

4    12940; disability discrimination in violation of FEHA;

5    retaliation in violation of FEHA; hostile work environment

6    harassment in violation of FEHA; wrongful termination in

7    violation of public policy; and sexual harassment in violation of

8    Title VII.  (Docket No. 1.)  Defendants now move for summary

9    judgment, or in the alternative partial summary judgment,

10   pursuant to Federal Rule of Civil Procedure 56.

11   IV.  Discussion

12           Plaintiff's claims for discrimination, retaliation, and

13   wrongful termination are subject to the McDonnell Douglas burden-

14   shifting analysis used at summary judgment to determine whether

15   there are triable issues of fact for resolution by a jury.[1]

16   Under McDonnell Douglas,

17       a plaintiff must first establish a prima facie case of
         discrimination [or other illegal conduct].  The burden
18       then shifts to the employer to articulate a legitimate,
         nondiscriminatory reason for its employment action.  If
19       the employer meets this burden, the presumption of
         intentional discrimination [or other illegal conduct]
20       disappears, but the plaintiff can still prove disparate
         treatment  by,  for  instance,  offering  evidence
21       demonstrating  that  the  employer's  explanation  is
         pretextual.
22

23   Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3 (2003) (internal

24   citation omitted).

25

26       [1]   Guz v. Bechtel Nat'l Inc., 24 Cal. 4th 317, 354 (2000)
     (discrimination); Loggins v. Kaiser Permanente Int'l, 151 Cal.
27   App. 4th 1102, 1108-09 (4th Dist. 2007) (retaliation and wrongful
     termination); see McDonnell Douglas Corp. v. Green, 411 U.S. 792
28   (1973).

                                   11

1    Because of the similarities between Title VII and FEHA,

2 "California courts frequently seek guidance from Title VII

3 decisions when interpreting the FEHA and its prohibitions against

4 sexual harassment." <u>Lyle v. Warner Bros. Television Prods.</u>, 38

5 Cal. 4th 264, 278 (2006); <u>see</u> <u>Guz v. Bechtel Nat'l Inc.</u>, 24 Cal.

6 4th 317, 354 (2000) (same regarding discrimination).

7    A.   <u>FEHA Gender Discrimination Claim Against TTI</u>

8    FEHA makes it unlawful for "an employer, because of . .

9 . sex . . . to discharge the person from employment . . . or to

10 discriminate against the person in compensation or in terms,

11 conditions, or privileges of employment."  Cal. Gov't Code §

12 12940(a).  To make a prima facie showing of sex discrimination, a

13 plaintiff must:

14       provide evidence that (1) he was a member of a protected
         class, (2) he was qualified for the position he sought or
15       was performing competently in the position he held, (3)
         he suffered an adverse employment action, such as
16       termination, demotion, or denial of an available job, and
         (4) some other circumstance suggests discriminatory
17       motive.

18 <u>Guz</u>, 24 Cal. 4th at 355.  Plaintiff has failed to satisfy the

19 third and fourth prongs of this test.

20    Plaintiff's theory of gender discrimination is that

21 Parker's alleged romantic relationship with Kelsheimer resulted

22 in Kelsheimer receiving favors not accorded to other employees

23 and Parker passing on some of Kelsheimer's work assignments to

24 plaintiff and other employees.  The viability of this claim

25 depends on the so-called "paramour" theory of gender

26 discrimination.  More precisely, this claim advances the theory

27 that a supervisor's personal relationship with a co-worker

28 coupled with favoritism can constitute discrimination.

Under California law, "a romantic relationship between a supervisor and an employee does not, without more, give rise to a sexual discrimination or sexual harassment claim under either the FEHA or the public policy of the state." Proskel v. Gattis, 41 Cal. App. 4th 1626, 1631 (4th Dist. 1996). The Proskel court cited the Equal Employment Opportunity Commission to support its conclusion:

> Not all types of sexual favoritism violate Title VII. It is the Commission's position that Title VII does not prohibit isolated instances of preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a "paramour" (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.

Id. at 1630 (citing EEOC Notice No. 915-048 (Jan. 12, 1990)).

Federal law is also instructive. One District of Columbia Circuit decision tacitly endorsed the paramour theory of discrimination in dicta. See King v. Palmer, 778 F.2d 878 (D.C. Cir. 1985), abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) (stating that "unlawful sex discrimination occurs whenever sex is for no legitimate reason a substantial factor in the discrimination.") Aside from this decision, however, "every other federal court which has considered the propriety of the 'paramour' theory has rejected it as a Title VII cause of action." Alberto v. Bank of Am., No. C-94-1283, 1995 WL 562170, at *4 (N.D. Cal. Sept. 13, 1995); see Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 908-09 (8th Cir. 2006) (termination of an employee based on the employee's consensual sexual conduct with a supervisor is not a violation of Title VII); Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 382 (5th

1  Cir. 2003); <u>Schobert v. Ill. Dep't of Transp.</u>, 304 F.3d 725, 733

2  (7th Cir. 2002) (Title VII does not prevent employers from

3  favoring employees because of personal relationships); <u>Womack v.</u>

4  <u>Runyon</u>, 147 F.3d 1298, 1300 (11th Cir. 1998); <u>Taken v. Okla.</u>

5  <u>Corp. Comm'n</u>, 125 F.3d 1366, 1370 (10th Cir. 1997); <u>Becerra v.</u>

6  <u>Dalton</u>, 94 F.3d 145, 149-50 (4th Cir. 1996); <u>DeCintio v.</u>

7  <u>Westchester Cnty. Med. Ctr.</u>, 807 F.2d 304 (2d Cir. 1986).  Each

8  of these courts reasoned that "when an employer discriminates in

9  favor of a paramour, such an action is not sex-based

10  discrimination, as the favoritism, while unfair, disadvantages

11  both sexes alike for reasons other than gender."  <u>Ackel</u>, 339 F.3d

12  at 382 (citing <u>Green v. Adm'rs of Tulane Educ. Fund</u>, 284 F.3d

13  642, 656 n.6 (5th Cir. 2002)).

14      While favoritism <u>with</u> more might constitute

15  discrimination under the paramour theory in California, plaintiff

16  has failed to meet his burden.  The only adverse employment

17  action he cites in support of his gender discrimination claim is

18  that he was required to complete some of Kelsheimer's work

19  assignments.  He also stated in his deposition that he heard Troy

20  state that he "wanted pretty women in as many positions as

21  possible" (Nielsen Dep. at 255:10-14), but did not provide any

22  evidence of adverse employment actions that resulted.  Even

23  assuming that being given extra work constitutes an adverse

24  employment action, plaintiff has failed to show that he was

25  treated disparately based on his gender.  Rather, any advantages

26  given Kelsheimer were solely based on her relationship with

27  Parker.  Plaintiff does not claim he suffered any other type of

28  gender-based discrimination.  Given these facts as well as the

1  overwhelming weight of authority cited above, the court finds
2  plaintiff's claim of gender discrimination under FEHA fails as a
3  matter of law and will accordingly grant TTI's motion for summary
4  judgment on that claim.

5      B.   <u>FEHA Disability Discrimination Claim Against TTI</u>

6          FEHA also prohibits discrimination based on disability.
7  Cal. Gov't Code § 12940(a).  To establish a prima facie case of
8  disability discrimination, a plaintiff must show that: (1) he or
9  she suffered from a disability; (2) could perform the essential
10 duties of the job with or without reasonable accommodations,
11 i.e., he was a "qualified individual"; and (3) was subjected to
12 an adverse employment action because of the disability.  <u>Brundage</u>
13 <u>v. Hahn</u>, 57 Cal. App. 4th 228, 236 (2d Dist. 1997); <u>see also</u>
14 <u>Green v. State of Cal.</u>, 42 Cal. 4th 254, 262 (2007) (a plaintiff
15 bears the burden as part of a prima facie case to show he could
16 perform "essential job duties" with or without accommodation).

17         It is undisputed that plaintiff suffered from a
18 temporary disability.  His complaints of "adverse employment
19 action" can be split into two categories: those actions during
20 his employment and the alleged termination.  For the first
21 category, defendants do not dispute that plaintiff was physically
22 able to perform the essential duties of his job with or without
23 reasonable accommodation.  Instead, the issues are whether
24 plaintiff was subjected to an adverse employment action and
25 whether that action occurred <u>because of</u> his disability.
26 Plaintiff's only contentions are that "Troy Glenn repeatedly
27 attacked . . . his effectiveness and work on the [CNG] project,"
28 he was "required to work 30 days straight" without being offered

15

a special work arrangement, he was "given conflicting instructions and directions" about the project, and Pedone "never offered [him] assistance." (Pl.'s Opp'n at 13.)   Most of these claims describe a stressful work environment but have nothing to do with plaintiff's disability.   <u>See</u> <u>Arteaga v. Brink's, Inc.</u>, 163 Cal. App. 4th 327, 344 (2d Dist. 2008) ("The FEHA does not guarantee employees a stress-free working environment. . . .   It is not a shield against harsh treatment at the workplace.") (internal quotation marks and citation omitted).   The only allegations having anything to do with plaintiff's disability are those regarding denial of any special assistance.   However, plaintiff admits that the only special accommodation he requested was a digital voice recorder, which he was given.   (Nielsen Dep. at 123:7-18, 124:17-22; Parker Dep. at 99:4-100:2; Pedone Dep. at 109:16-23, 110:21-25.)   Plaintiff does not claim that he was treated differently than other employees, nor does he claim that he requested accommodations that he was not given.

     The other category of alleged discrimination involves plaintiff's termination.   Termination is indisputably an adverse employment action.   Construing the facts most favorably to plaintiff, the court assumes that TTI granted the third leave of absence but then terminated plaintiff on December 30, 2008. Thus, the court does not decide whether the third leave of absence constituted a "reasonable accommodation."

     While the "Employee Separation Report" stating that plaintiff's employment ended by "Voluntary Resignation" because he "failed to return from leave of absence" (Pl.'s Opp'n Ex. 29) is in conflict with plaintiff's contention that he was

terminated, it may be enough to satisfy the prima facie burden of
showing that employment action was taken "because of" his
disability.   The burden then shifts to TTI, which has adequately
shown a legitimate reason for denying the request.   TTI lost its
biggest contract during plaintiff's leave and had to undergo
major reorganization, which included cutting plaintiff's position
entirely.   Plaintiff admitted that he poorly led the CNG proposal
team, and he had been placed on a performance improvement plan to
improve his work, especially regarding deadlines.   TTI's
financial difficulties, coupled with the documented deficiencies
in plaintiff's work, provide a legitimate reason for plaintiff's
termination.   <u>See</u> <u>Diaz v. Eagle Produce Ltd. P'ship</u>, 421 F.3d
1201, 1212 (9th Cir. 2008) (employer must give a reason why
plaintiff was included in the group that was terminated as part
of workforce reduction); <u>see also</u> <u>Arteaga v. Brink's, Inc.</u>, 163
Cal. App. 4th 327, 344 (2d Dist. 2008) ("The employer may fire an
employee for a good reason, a bad reason, a reason based on
erroneous facts, or for no reason at all, as long as its action
is not for a discriminatory reason.") (internal quotations and
citations omitted).   Defendants have provided a legitimate reason
for plaintiff's termination and plaintiff has provided no
argument or evidence that the company's financial situation
coupled with his poor performance was just a pretext to terminate
him because of his disability.

     Accordingly, plaintiff's claim of disability
discrimination under FEHA fails as a matter of law and the court
will grant TTI's motion for summary judgment on that claim.

     C.   <u>FEHA Hostile Work Environment Sexual and Disability</u>

17

1        Harassment Claim Against All Defendants and Title VII

2        Sexual Harassment Claim Against TTI

3              FEHA makes it illegal for an employer "because of . . .

4   physical disability . . . [or] sex . . . to harass an employee .

5   . . ."  Cal. Gov't Code § 12940(j)(1).  Similarly, Title VII

6   prohibits sexual harassment that is so "severe or pervasive" as

7   to "alter the conditions of [the victim's] employment and create

8   an abusive working environment."  Meritor Sav. Bank, FSB v.

9   Vinson, 477 U.S. 57, 67 (1986).  FEHA and Title VII require the

10  same showing for a prima facie case:

11        To prevail on a hostile work environment claim under
          California's FEHA, an employee must show that the
12        harassing conduct was severe enough or sufficiently
          pervasive to alter the conditions of employment and
13        create a work environment that qualifies as hostile or
          abusive to employees because of their sex [or
14        disability].  There is no recovery for harassment that is
          occasional, isolated, sporadic, or trivial.
15

16  Hughes v. Pair, 46 Cal. 4th 1035, 1043 (2009) (internal quotation

17  marks and citations omitted); see Craig v. M & O Agencies, Inc.,

18  496 F.3d 1047, 1054-55 (9th Cir. 2007) (Title VII sexual

19  harassment).  The environment must be both objectively and

20  subjectively offensive.  Hughes, 46 Cal. 4th at 1044; see Harris

21  v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  In addition

22  to employers, employees are subject to personal liability for

23  harassment under FEHA but not Title VII.  Cal. Gov't Code §

24  12940(j)(3).

25        1.    Sexual Harassment Claims (FEHA and Title VII)

26              Where "there is no conduct other than favoritism toward

27  a paramour, the overwhelming weight of authority holds that no

28  claim of sexual harassment or discrimination exists."  Proskel v.

                                    18

1  <u>Gattis</u>, 41 Cal. App. 4th 1626, 1630 (4th Dist. 1996); <u>see, e.g.</u>,

2  <u>Candelore v. Clark Cnty. Sanitation Dist.</u>, 975 F.2d 588, 590 (9th

3  Cir. 1992) ("A co-worker's romantic involvement with a supervisor

4  does not by itself create a hostile work environment.").  "An

5  exception to this general rule exists, however, if the workplace

6  affair entails 'widespread' sexual conduct to which other

7  employees are exposed, such as flagrant boasting about the

8  relationship and/or public displays of affection."  <u>Perron v.</u>

9  <u>Sec'y, Dep't of Health & Human Servs.</u>, No. 2:06-cv-02429 MCE GGH,

10 2007 WL 4219171, at *4 (E.D. Cal. Nov. 29, 2007) (quoting <u>Miller</u>

11 <u>v. Dep't of Corrs.</u>, 36 Cal. 4th 446, 471 (2005)).  In <u>Miller</u>, the

12 favoritism at issue included "abuse and harassment against

13 [plaintiffs] by [a] supervisor's paramour[], flagrant boasting by

14 the favored women, eyewitness accounts of public fondling,

15 admissions by the supervisor that he could not control his

16 paramours based on the sexual relationship between them, and

17 repeated promotions based on sexual favors rather than on

18 qualifications."  <u>Alaniz v. Robert M. Peppercorn, M.D., Inc.</u>, No.

19 2:05-CV-2576 MCE DAD, 2007 WL 1299804, at *6 (E.D. Cal. May 3,

20 2007).

21      In contrast, plaintiff's claim of a hostile work

22 environment is based on Parker's act of occasionally assigning

23 Kelsheimer's work to plaintiff and Troy's alleged statement that

24 he "wanted pretty women in as many positions as possible."

25 (Nielsen Dep. at 255:10-14.)  Beyond the emails between Parker

26 and Kelsheimer, which were private and not meant to be viewed by

27 plaintiff or others, the only conduct of a sexual nature

28 plaintiff has shown is occasional flirting between Parker and

1  Kelsheimer.  Plaintiff has shown nothing that could possibly be
2  construed as severe or pervasive.  Plaintiff has also failed to
3  provide any evidence establishing that he was harassed "because
4  of" his gender.

5          Accordingly, plaintiff's claims of sexual harassment
6  based upon a hostile work environment under Title VII and FEHA
7  fail as a matter of law as to all defendants and the court will
8  grant defendants' motion for summary judgment on those claims.

9                  2.  <u>Disability Harassment Claim (FEHA)</u>

10         Harassment because of disability is subject to the same
11 standard as sexual harassment.  Plaintiff's strongest, and indeed
12 only, contention is that he spoke to Troy after the accident and
13 "came away with the understanding" that his job would be in
14 jeopardy if he did not take the lead on the CNG proposal.  (Pl.'s
15 Opp'n at 11.)  It is unclear how requiring plaintiff to work on a
16 project constitutes harassment <u>because of</u> plaintiff's disability.
17 Harassment, like discrimination, occurs only where an employee is
18 treated differently and that difference was based on his
19 disability.  Plaintiff did not request any accommodation on the
20 project, nor does he contend that he was unable to perform the
21 necessary work on the project.  A mere "understanding" that an
22 employee is being told to do a job when the employer has no
23 reason to believe the employee cannot perform the job is
24 insufficient to show a prima facie case of harassment.  <u>See</u> <u>Avila</u>
25 <u>v. Continental Airlines, Inc.</u>, 165 Cal. App. 4th 1237, 1252 (2d
26 Dist. 2008) (to show failure to accommodate, the employee must
27 have requested an accommodation).

28         Plaintiff's other complaints about his treatment at

                                20

1  work, as discussed regarding his discrimination claim, similarly

2  have no relation to his disability: he claims that Troy

3  "attacked" his effectiveness, he was "required to work 30 days

4  straight," and he was "given conflicting instructions and

5  directions" regarding the proposal.  (Pl.'s Opp'n at 11.)

6  Plaintiff does not contend that this treatment was any different

7  from the way non-disabled employees were treated.  See Arteaga,

8  163 Cal. App. 4th at 344.  Thus, plaintiff has failed to show

9  that he was harassed or subject to a hostile work environment

10  because of his disability; he certainly has not shown that the

11  harassment was severe and pervasive.

12       Accordingly, plaintiff's claim of disability harassment

13  based upon a hostile work environment under FEHA fails as a

14  matter of law as to all defendants and the court will grant

15  defendants' motion for summary judgment on that claim.

16       D.   FEHA Retaliation Claim Against TTI

17       FEHA makes it illegal for an employer "to discharge,

18  expel, or otherwise discriminate against any person because the

19  person has opposed any practices forbidden under [FEHA] or

20  because the person has filed a complaint, testified, or assisted

21  in any proceeding under [FEHA]."  Cal. Gov't Code § 12940(h).

22  FEHA retaliation claims are evaluated under federal law

23  interpreting Title VII cases.  Flait v. N. Am. Watch Corp., 3

24  Cal. App. 4th 467, 475-76 (2d Dist. 1992).

25       A plaintiff establishes a prima facie case of

26  retaliation under FEHA by demonstrating: (1) he engaged in

27  protected activity; (2) he suffered an adverse employment action;

28  and (3) there is a causal link between the activity and the

1  employment action.  <u>Raad v. Fairbanks N. Star Borough Sch. Dist.</u>,

2  323 F.3d 1185, 1197 (9th Cir. 2003); <u>see</u> <u>Yanowitz v. L'Oreal USA,</u>

3  <u>Inc.</u>, 36 Cal. 4th 1028, 1042 (2005).

4        Plaintiff asserts that his complaints to Pedone

5  regarding the alleged affair between Parker and Kelsheimer were a

6  protected activity for purposes of his retaliation claim.  An

7  employee's conduct may constitute protected activity for purposes

8  of a retaliation claim not only when the employee opposes conduct

9  that ultimately is determined to be unlawful, but also when the

10  employee opposes conduct that the employee reasonably and in good

11  faith believes is unlawful, whether or not that belief is

12  ultimately borne out.  <u>Yanowitz</u>, 36 Cal. 4th at 1043.  Even if

13  the alleged relationship between Parker and Kelsheimer is

14  insufficient to support a viable discrimination or harassment

15  claim, that fact alone does not defeat plaintiff's claim that he

16  reasonably believed his complaints to Pedone opposed unlawful

17  conduct.  As a result, the court cannot rule out that plaintiff

18  engaged in protected activity, especially since it must resolve

19  all inferences in plaintiff's favor on a motion for summary

20  judgment.

21        With respect to whether he suffered an adverse

22  employment action, plaintiff has shown that he was reprimanded by

23  Parker and ultimately terminated.  This evidence is sufficient to

24  constitute an adverse employment action for purposes of stating a

25  viable retaliation claim.

26        The more difficult inquiry concerns whether the adverse

27  employment actions are causally related to plaintiff's protected

28  activity.  "The causal link between a protected activity and the

alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two." <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 812 (9th Cir. 2004) (citing <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1065 (9th Cir. 2002)).  Plaintiff has established that his conversation with Parker and subsequent implementation of the performance improvement plan took place soon after plaintiff complained of Parker's affair to Pedone.  While not as close in time, plaintiff's termination occurred within months of his protected activity while he was on leave.  Thus, plaintiff has met the burden of showing a prima facie case of retaliation.

Once an employee establishes a prima facie case, the employer is required to offer a legitimate, non-retaliatory reason for the adverse employment action.  <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 928 (9th Cir. 2000); <u>Yanowitz</u>, 36 Cal. 4th at 1042.  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation is removed, and the burden shifts back to the employee to prove the reason is pretextual.  <u>Brooks</u>, 229 F.3d at 928; <u>Yamotiz</u>, 36 Cal. 4th at 1042.

Defendants have offered a legitimate reason for placing plaintiff on a performance improvement plan.  Defendants provided documentation of plaintiff's poor work performance and plaintiff admitted that he did a poor job in leading the CNG proposal.  Plaintiff argues that evidence of his other, positive performance reviews helps to establish pretext.  However, those reviews occurred before plaintiff held the position of program manager.  Indeed, defendants point out that plaintiff received negative

1  feedback from Parker in January 2008, before plaintiff had

2  engaged in any protected activity that could possibly lead to

3  retaliation.  (See Parker Dep. Ex. 52.)  Without more, plaintiff

4  cannot establish pretext.   See Loggins v. Kaiser Permanente

5  Int'l, 151 Cal. App. 4th 1102, 1112 (4th Dist. 2007) ("temporal

6  proximity . . . does not, without more" establish pretext).

7         Regarding the termination, defendants explain that

8  plaintiff was terminated as a result of TTI's reorganization in

9  light of the loss of its biggest contract and because of

10  plaintiff's poor work performance.  As explained above, this

11  decision is a legitimate reason for the adverse employment

12  action.  Plaintiff argues that termination during a third leave

13  of absence, when nothing has changed since the first two leaves,

14  shows that defendants were retaliating against him.  However,

15  defendants did show that something changed: the loss of TTI's

16  biggest contract led to a company reorganization that

17  necessitated the elimination of plaintiff's position.  Plaintiff

18  has not given the court any reason to disbelieve defendants'

19  explanation.  See Grozs v. Boeing Co., 455 F. Supp. 2d 1033, 1041

20  (C.D. Cal. 2006) (when an employee's position is completely

21  eliminated, pretext is difficult to establish).

22         Accordingly, plaintiff's claim of retaliation under

23  FEHA fails as a matter of law and the court will thus grant TTI's

24  motion for summary judgment on that claim.

25     E.   Wrongful Termination in Violation of Public Policy

26          Claim Against TTI

27         "In order to sustain a claim of wrongful discharge in

28  violation of fundamental public policy, [a plaintiff] must prove

24

1  that his dismissal violated a policy that is (1) fundamental, (2)

2  beneficial for the public, and (3) embodied in a statute or

3  constitutional provision." <u>Turner v. Anheuser-Busch, Inc.</u>, 7

4  Cal. 4th 1238, 1256 (1994) (footnotes omitted).

5          Plaintiff's claim for wrongful termination in violation

6  of public policy is derivative of his statutory claims.  <u>See</u>

7  <u>Sanders v. Arneson Prods., Inc.</u>, 91 F.3d 1351, 1354 (9th Cir.

8  1996) (citing <u>Jennings v. Marralle</u>, 8 Cal. 4th 121, 135-36

9  (1994).  As summary judgment has been granted on plaintiff's

10 other claims, summary judgment is similarly granted on the public

11 policy claim.  <u>See</u> <u>Cavanaugh v. Unisource Worldwide, Inc.</u>, No.

12 CIV-F-06-0119 AWI DLB, 2007 WL 915223, at *11 (E.D. Cal. Mar. 26,

13 2007).  Accordingly, plaintiff's claim of wrongful termination in

14 violation of public policy fails as a matter of law and the court

15 will grant TTI's motion for summary judgment on that claim.

16         IT IS THEREFORE ORDERED that defendants' motion for

17 summary judgment be, and the same hereby is, GRANTED.

18 DATED:  November 1, 2010

19

20 _____

21 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

25